# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

MELISSA K. SHAW,
    Plaintiff,

Case No. 1:16-cv-1133
Barrett, J.
Litkovitz, M.J.

vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

**REPORT AND
RECOMMENDATION**

Plaintiff Melissa K. Shaw brings this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3) for judicial review of the final decision of the Commissioner of Social Security

("Commissioner") denying plaintiff's applications for disability insurance benefits ("DIB") and

supplemental security income ("SSI"). This matter is before the Court on plaintiff's Statement

of Errors (Doc. 6), the Commissioner's response in opposition (Doc. 7), and plaintiff's reply

(Doc. 8).

## I. Procedural Background

Plaintiff filed applications for DIB in May 2013 and SSI in July 2013, alleging disability

since December 4, 2012 due to lumbar compressive neuropathy and Sjogren's Syndrome.[1]

Plaintiff's applications were denied initially and upon reconsideration. Plaintiff, through

counsel, requested and was granted a *de novo* hearing before ALJ Peter Jamison. Plaintiff and a

vocational expert (VE) appeared and testified at the ALJ hearing. On September 11, 2015, the

ALJ issued a decision denying plaintiff's DIB and SSI applications. (Tr. 13-26). Plaintiff's

---

[1] Sjogren's Syndrome is a disorder of the immune system identified by its two most common symptoms, which are
dry eyes and a dry mouth. https://www.mayoclinic.org/diseases-conditions/sjogrens-syndrome/symptoms-
causes/syc-20353216.

request for review by the Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment - *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four

steps of the sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir. 1999).

## B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

> 1. The [plaintiff met] the insured status requirements of the Social Security Act through December 31, 2017.
>
> 2. The [plaintiff] has not engaged in substantial gainful activity since December 5, 2012, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*) [].
>
> 3. The [plaintiff] has the following severe impairments: fibromyalgia; Sjogren's Syndrome; mild to moderate osteoarthritis of bilateral hands and lumbar spine; autoimmune disorder, unspecified; dermatitis; affective disorders; and somatoform disorder (20 CFR 404.1520(c) and 416.920(c)).
>
> 4. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> 5. After careful consideration of the entire record, the [ALJ] finds that the [plaintiff] has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c). She can lift and carry occasionally up to 50 pounds; she can lift and carry frequently up to 25 pounds. She can stand 6 hours in an 8-hour workday, walk 6 hours in an 8-hour workday, and sit 6 hours in an 8-hour workday. She can climb ramps and stairs frequently; climb ladders, ropes, and scaffolds occasionally; she can balance, stoop, kneel, crouch, and crawl frequently. She is limited to simple, routine and repetitive tasks, but not at a production-rate pace. She is limited to simple work-related decisions; she can have no more than superficial interaction with co-workers and supervisors, and only occasional interaction with the public. She can have no more than ordinary and routine changes in the work setting and duties.

6. The [plaintiff] is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).[2]

7. The [plaintiff] was born [in] . . . 1960 and was 52 years old, which is defined as an individual of advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).[3]

11. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from December 5, 2012, through the date of [the ALJ's] decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 15-25).

### C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

---

[2] Plaintiff's past relevant work was skilled work as a registered nurse, which requires medium exertion, and as a registered nurse in a community health center and a medical supervisor in a medical office, both of which require light exertion. (Tr. 25-26).

[3] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative unskilled, medium exertion level jobs such as production planning clerk (148 jobs regionally and 19,000 jobs nationally), stock clerk/order filler, linen room attendant (596 jobs regionally and 88,000 jobs nationally), and weights/measure/checker clerk (118 jobs regionally and 15,000 jobs nationally). (Tr. 25).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

**D. Specific Errors**

On appeal, plaintiff alleges the following assignments of error: (1) the ALJ erred in evaluating plaintiff's fibromyalgia and the functional limitations imposed by her fibromyalgia; (2) the ALJ erred in weighing the medical source opinions, and specifically by giving the most weight to the opinion of the state agency reviewing physician, who did not have a complete record before her, and the least weight to the partial assessment completed by plaintiff's treating rheumatologist; (3) the ALJ erred in assessing plaintiff's credibility in light of the objective medical evidence, plaintiff's self-reports of her symptoms, limitations and medication side-

effects, and plaintiff's work history; and (4) the ALJ erred by relying on vocational expert

testimony that did not take into account functional hand limitations imposed by plaintiff's

arthritis and mental limitations assessed by the consultative examining psychologist.  (Doc. 6).

### 1. The ALJ's evaluation of plaintiff's fibromyalgia

Plaintiff alleges the ALJ erred in evaluating the functional limitations imposed by her

fibromyalgia.  (Doc. 6).  Plaintiff argues the ALJ improperly considered normal examination

results and the lack of objective findings when evaluating her fibromyalgia, which negatively

impacted the ALJ's weighing of the medical source opinions and his assessment of plaintiff's

credibility (Tr. 21-24)[4]; the ALJ improperly dismissed clinical findings of tender points made by

plaintiff's medical providers as too imprecise (Tr. 17, 567, 635, 708, 830);  the ALJ improperly

referenced a medical text on fibromyalgia in his written decision without including it in the

record (Tr. 17); the ALJ did not recognize that plaintiff's fatigue, which is documented in the

medical records, is a symptom of fibromyalgia which would prevent plaintiff from performing

light or medium work on a sustained basis (Tr. 431, 442, 646, 775, 847); and the ALJ failed to

consider plaintiff's impairments in combination, including lumbar spine and leg impairments

disclosed on an EMG (Tr. 674) and lesions and osteoarthritis of the hands (Tr. 819-20, 841).

(Doc. 6 at 4-7).

In response, the Commissioner argues that plaintiff's challenges to the ALJ's evaluation

of the functional limitations imposed by her fibromyalgia and the RFC finding is not supported

by the record.  (Doc. 7 at 8).  The Commissioner notes that the ALJ credited plaintiff's

fibromyalgia diagnosis and found fibromyalgia to be a severe impairment, but the Commissioner

---

[4] Insofar as plaintiff challenges the weight the ALJ gave the medical opinions of record and the ALJ's credibility
assessment, the Court will consider plaintiff's arguments in connection with her second and third assignments of
error.

argues the ALJ properly found the evidence of record did not support a finding that plaintiff's fibromyalgia imposed any work-related functional limitations. (*Id*. at 9-10).

### a. Legal standards for evaluating fibromyalgia

Social Security Ruling 12-2p provides guidance on how the Social Security Administration both "develop[s] evidence to establish that a person has a medically determinable impairment of fibromyalgia" and "how [the SSA] evaluate[s] fibromyalgia in disability claims[.]"[5] SSR 12-2p, 2012 WL 3104869, at *2 (July 25, 2012). Under the Ruling, "FM (fibromyalgia) is an MDI (medically determinable impairment) when it is established by appropriate medical evidence," and the disease "can be the basis for a finding of disability." *Id*. SSR 12-2p describes fibromyalgia as "a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." *Id*. SSR 12-2p explains that fibromyalgia is a "common syndrome" and that a person's symptoms must be considered in determining if the individual has a medically determinable impairment of fibromyalgia. *Id*. If a physician diagnoses fibromyalgia, the agency will "review the physician's treatment notes to see if they are consistent with the diagnosis of FM, determine whether the person's symptoms have improved, worsened, or remained stable over time, and establish the physician's assessment over time of the person's physical strength and functional abilities." *Id*.

The Sixth Circuit has instructed that "[t]he process of diagnosing fibromyalgia includes (1) the testing of a series of focal points for tenderness and (2) the ruling out of other possible

---

[5] "Social Security Rulings do not have the force and effect of law, but are 'binding on all components of the Social Security Administration' and represent 'precedent final opinions and orders and statements of policy and interpretations' adopted by the Commissioner." *Ferguson v. Comm'r of Soc Sec.,* 628 F.3d 269, 272 n.l (6th Cir. 2010) (quoting 20 C.F.R. § 402.35(b)(1)). The Sixth Circuit has refrained from ruling on whether Social Security Rulings are binding on the Commissioner in the same way as Social Security Regulations but has assumed that they are. *Id.* (citing *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 549 (6th Cir. 2001)).

conditions through objective medical and clinical trials." *Rogers*, 486 F.3d at 244 (citing

*Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988); *Swain v. Comm'r*

*of Soc. Sec.*, 297 F. Supp.2d 986, 990 (N.D. Ohio 2003)). In contrast to patients with other types

of medical conditions that can be confirmed by objective testing, "fibromyalgia patients present

no objectively alarming signs." *Id.* (citing *Preston*, 854 F.2d at 820). Rather, these patients

"manifest normal muscle strength and neurological reactions and have a full range of motion."

*Id.* (quoting *Preston,* 854 F.2d at 820). *See also Kalmbach v. Comm'r*, 409 F. App'x 852,

861-62 (6th Cir. 2015); *Herzog v. Comm'r of Soc. Sec.*, No. 2:16-cv-244, 2017 WL 4296310, at

*4 (S.D. Ohio Sept. 28, 2017) (citing *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 434 (6th

Cir. 2013)). Thus, objective tests or observations of muscle strength, range of motion, joint

swelling and neurological reactions are of limited or no value in the typical fibromyalgia case as

these signs would not ordinarily be expected. *Preston*, 854 F.2d at 820; *Rogers*, 486 F.3d at 245

("in light of the unique evidentiary difficulties associated with the diagnosis and treatment of

fibromyalgia, opinions that focus solely upon objective evidence are not particularly relevant");

*Kalmbach*, 409 F. App'x at 864 (the absence of objective medical evidence to substantiate the

diagnosis of fibromyalgia or its severity is basically irrelevant); *Germany-Johnson v.*

*Commissioner of Social Sec.*, 313 F. App'x 771, 778 (6th Cir. 2008).

 SSR 12-2 provides that the ALJ must apply one of two sets of criteria for finding that

fibromyalgia is a medically determinable impairment: (1) the 1990 American College of

Rheumatology (ACR) Criteria for Classification of Fibromyalgia (SSR 12-2, § II.A); or (2) the

2010 ACR Preliminary Diagnostic Criteria (*Id.*, § II.B). *Herzog*, 2017 WL 4296310, at *2

(citing SSR 12-2p, 2012 WL 3104869, at *2-3). Under § II.A, fibromyalgia may be found to

constitute a medically determinable impairment if the claimant has: "(1) a history of widespread

pain in all quadrants of the body for at least three months; (2) at least eleven positive tender points found bilaterally on the left and right sides of the body [and both above and below the waist] on physical examination; and (3) evidence that other disorders that could cause the symptoms were excluded . . . (for example, complete blood counts, erythrocyte sedimentation rate, anti-nuclear antibody, thyroid function, and rheumatoid factor)." *Id.* (citing SSR 12-2p, 2012 WL 3104869, at *2-3). Under § II.B and the 2010 ACR criteria, fibromyalgia is a medically determinable impairment where the following criteria are shown: "(1) a history of widespread pain; (2) repeated manifestations of six or more fibromyalgia symptoms or signs, such as fatigue, cognitive or memory problems, waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome; and (3) evidence that other disorders that could cause the symptoms were excluded." *Id.* (citing SSR 12-2p, 2012 WL 3104869 at *3). Other signs of fibromyalgia include "muscle pain, . . . muscle weakness, headache, pain or cramps in the abdomen, numbness or tingling, dizziness, insomnia, depression, constipation, pain in the upper abdomen, nausea, nervousness, chest pain, blurred vision, fever, diarrhea, dry mouth, itching, wheezing, Raynaud's phenomenon, hives or welts, ringing in the ears, vomiting, heartburn, oral ulcers, loss of taste, change in taste, seizures, dry eyes, shortness of breath, loss of appetite, rash, sun sensitivity, hearing difficulties, easy bruising, hair loss, frequent urination, or bladder spasms." *Id.*, § II.B.2, n.9. Co-occurring conditions include irritable bowel syndrome or depression and "anxiety disorder, chronic fatigue syndrome, irritable bladder syndrome, interstitial cystitis, temporomandibular joint disorder, gastroesophageal reflux disorder, migraine, or restless leg syndrome." *Id.*, n.10.

The mere fact that an individual has been diagnosed with fibromyalgia does not require a finding that the impairment is "severe" or debilitating. *Cornett v. Comm'r of Soc. Sec.*, No.

2:11-cv-00709, 2012 WL 3112370, at *11 (S.D. Ohio July 31, 2012) (Report and
Recommendation), *adopted,* 2012 WL 3887175 (S.D. Ohio Sept. 7, 2012) ("as with any other
impairment, the mere existence of fibromyalgia does not guarantee that a claimant will have a
severe impairment") (citing *Dragan v. Astrue,* No. 1:11-cv-44, 2011 WL 7430207, at *6 (S.D.
Ohio Dec.15, 2011) (Report and Recommendation), *adopted,* 2012 WL 642868 (S.D. Ohio Feb.
28, 2012) ("[T]he ambiguities inherent in the diagnosis does not mean that every suggestion of
fibromyalgia requires a conclusion that the condition is 'severe' or that it results in disability.");
*Foutty v. Comm'r of Soc. Sec.,* No. 5:10-cv-551, 2011 WL 2532915, at *7 (N.D. Ohio June 2,
2011) (Report and Recommendation), *adopted*, 2011 WL 2532397 (S.D. Ohio June 24, 2011)
(acknowledging that it is "error to rely on a lack of objective evidence to support denying
benefits to a fibromyalgia claimant" in light of the nature of the disease while affirming an ALJ's
finding of no severe fibromyalgia impairment because the ALJ reasonably based his finding in
part on his credibility assessment).

### b. Medical evidence of plaintiff's fibromyalgia and other severe impairments

The medical records include treatment notes completed by Dr. Randel K. Miller, M.D., of
the Watson Clinic LLP in Lakeland, Florida who saw plaintiff for a rheumatology evaluation
regarding diffuse muscle pain in February 2011 before plaintiff moved to Ohio. (Tr. 375-78).
Plaintiff complained of some muscle pain since at least 2002, "muscle pain all over," "some
tender points all over," and a "prominent sense of fatigue at times." (Tr. 376). Plaintiff reported
some general fatigue and a history of some swelling in the legs, muscle spasms, some skin
redness, and gastroesophageal reflux. She had a slightly positive "SSA" antibody in 2009 but all
other tests were normal. On examination, there were "multiple trigger points noted in all the
classical locations for fibromyalgia." (Tr. 377). Dr. Miller assessed fibromyalgia as a cause for

her muscle discomfort without any inflammatory changes in her joints or muscles at that time. The plan was to obtain an ANA (antinuclear antibody) reflex panel and notify plaintiff regarding the results and for plaintiff to increase her aerobic exercise as tolerated, decrease stress to the extent possible, get massages as needed, avoid "overdoing it" on her good days, and return to the clinic as needed.

Plaintiff presented to resident physician Dr. Vamsi Koduri, M.D., at Christ Hospital in Cincinnati to establish care and have disability paperwork completed on September 11, 2013. (Tr. 402-05). Plaintiff informed Dr. Koduri that she did not want to "try any medications or physical therapy" at that time and the primary reason she had come in was to have disability paperwork filled out. (Tr. 403). Plaintiff reported a 20-year history of progressively worsening back pain that she described as constant, sharp and stabbing in nature and which had been treated with physical therapy and facet block and epidural injections. (*Id.*). Plaintiff also complained of some burning and numbness/tingling in the lower extremities which had recently extended to her feet. Plaintiff reported she had been given prior diagnoses of Sjogren's Syndrome in 2007 with current symptoms of some mild dryness in the eyes and mouth, compressive neuropathy in 2011, and GERD (gastroesophageal reflux disease). Plaintiff was not currently on any medications and she reported she was not able to take "most medications" because they caused her to have what Dr. Koduri characterized as "vague side effects ranging from 'N/V', sedation headache, to numbness/tingling." (*Id.*). Plaintiff reported that she completed her activities of daily living independently but she did not exercise. Dr. Koduri advised plaintiff that he would not fill out any paperwork until he had obtained records from her prior primary care physician, her pain specialist, and any source who had seen her for back issues. Dr. Koduri ordered lab tests and

advised plaintiff to return to the clinic in three months. (Tr. 404-05). An ANA titer 1 test that was obtained was elevated at 1.160. (Tr. 413).

At her December 2013 appointment, plaintiff continued to complain of dull and aching lower back pain with intermittent episodes of sharp and stabbing pain, constant numbness/tingling radiating down both legs to her feet, and dryness of the eyes that was manageable at that time. (Tr. 535). She endorsed mild reflux symptoms after meals. (Tr. 536). She was not on any medications. The treatment notes report that plaintiff still wanted to have disability paperwork filled out. Dr. Koduri's plan was to refer plaintiff to physical therapy and start her on Flexeril on an as needed basis for back pain; begin Gabapentin for her numbness and tingling symptoms; and start Protonix for GERD. (Tr. 537). Dr. Koduri also recommended NSAIDS.

In January 2014, the attending physician at The Christ Hospital Clinic, Dr. John L. Houk, M.D., referred plaintiff to Dr. Ali Zeenat, M.D., who saw plaintiff as a new neurology patient. Dr. Houk's notes reflect that he spoke to plaintiff, examined her, and discussed her case with the rheumatology fellow. (Tr. 546). Dr. Houk reported that he did not have a diagnosis "or even a differential diagnosis," he opined she might have Sjogren's Syndrome because she had "sicca" symptoms[6] and a "positive SSA," and her chief complaint was diffuse pain. (*Id*.). Dr. Houk noted that an EMG showed diffuse neuritis of the lower extremities which was described as "compressive" neuropathy, but he did not know what that meant. (*Id*.). Dr. Zeenat's January 17, 2014 treatment notes report that plaintiff had complained of body aches for many years but she denied weakness; she had tingling/numbness in both legs but no leg weakness; she complained of occasional joint pain in her hands and feet and had noticed swelling in her hands; and she had

---

[6] "Sicca syndrome" is dryness of the mouth and eyes from inadequate secretion of saliva and tears occurring in the absence of a connective tissue disorder. https://medical-dictionary.thefreedictionary.com/sicca+syndrome.

developed facial and body rashes for several years that were worsened by makeup, body lotions and drugs, but she did not see a dermatologist and had not tried medications. The notes reflect that plaintiff had recently seen her primary care physician who had repeated lab work and found elevated SSA and "ANA 160." Plaintiff's current prescriptions included Gabapentin and Flexeril. (Tr. 565). On examination, plaintiff had "[m]ultiple tender points" and spinal and paraspinal tenderness, and her reflexes were 2/4 in all extremities. (Tr. 566). Plaintiff had many current skin issues consisting of a V shaped rash on her chest, a purplish rash on her knuckles and fingers, cracks on her fingers, hyperpigmented patches on the upper extremities below the elbows, and telangiectasia on her face.[7] Her Sjogren's Syndrome was assessed as stable. (Tr. 567). Plaiintiff had dry eyes and dry mouth but she did not want to try anything because of a rash in the past, and she currently had a rash of unclear etiology. The plan was to do lab work to find the cause of the rash and her arthralgias and myalgias and to refer plaintiff to neurology for her low back pain. (Tr. 567-68).

Plaintiff saw Ms. Debra Johnsen, CNP, at the Mt. Healthy Family Practice on May 23, 2014 to establish care after her move to Ohio from Florida. (Tr. 665-68). Plaintiff reported that she was currently unemployed due to an autoimmune disorder, chronic back pain, and nerve damage and she was attempting to obtain disability. (Tr. 666). No abnormal findings were made on physical examination. (Tr. 668). Plaintiff's diagnoses were autoimmune disorder, neuropathic pain, and Sjogren Syndrome. Ms. Johnsen encouraged plaintiff to stay with her current rheumatologist and indicated she would refer plaintiff to a neurologist for her neuropathic pain, noting that plaintiff was not currently on any pain medication. (Tr. 666).

---

[7] Telangiectasia is a vascular lesion formed by dilation of a small group of blood vessels. https://medical-dictionary.thefreedictionary.com/Telangectasia.

Dr. Colin Zadikoff, M.D., of Wellington Orthopedics performed a neurology exam on June 16, 2014. (Tr. 646-47). Plaintiff complained of pain that she had experienced for over 20 years but that had become more persistent and was usually 7-10 on the 10-point pain scale. (Tr. 646). Plaintiff described the pain as starting in the calves and legs and then progressing to the feet and thighs. She stated that the pain in her legs worsened when she sat in one position. Plaintiff reported that she had immune disorders, "the exact nature of which eluded" Dr. Zadikoff. (*Id*.). Plaintiff reported that she was not on any medications because she could not tolerate any because of her immune system. Plaintiff felt that she could no longer care for herself independently. She complained of excessive daytime sleepiness, fatigue and low energy. Dr. Zadikoff assessed plaintiff with peripheral neuropathy and concluded that plaintiff has "a pain syndrome" that he could not fully classify and he was not sure what was meant by an immune system dysfunction that caused her to not tolerate all medications. (Tr. 647). He advised plaintiff that the only way to treat her symptoms was with medication, which she agreed to think about, and he opined that there were not any other tests that could be performed. Plaintiff was to call him if she wished to try medication and to return as needed.

Plaintiff saw Ms. Johnsen again on July 8, 2014. (Tr. 665). She noted that she was going to refer plaintiff to a rheumatologist at UC physicians and gave her a number to call for an appointment. (Tr. 663). She also recommended that plaintiff have a functional assessment done at Drake Hospital. (*Id*.). Ms. Johnsen advised plaintiff to let her office know when plaintiff wanted to do this so she could initiate the referral because Ms. Johnsen was unable to do a functional assessment. (*Id*.).

Ms. Johnsen next saw plaintiff on September 30, 2014. (Tr. 661-62). Plaintiff had visual lesions/erythema on the head and face and scattered erythematous annular lesions on the face.

(Tr. 661). Ms. Johnsen assessed plaintiff with a "[m]inor hypersensitivity (allergic) skin reaction that occurs in response to medication or illness." (Tr. 660). The notes reflect that plaintiff "had hypersensitivity reaction to soap she was using causing hives and angioedema, to ED (emergency department) where she was given some prednisone." Ms. Johnsen prescribed cetirizine and gave her a few more days of prednisone to taper. (*Id*.).

Plaintiff saw Ms. Johnsen on November 4, 2014 for a follow-up from her second emergency room visit. (Tr. 657-59). Plaintiff reported she had "severe" neuropathy that occurred constantly and was aggravated by movement, rest and standing and was not relieved by anything. (Tr. 657). Plaintiff presented with anxious and tearful thoughts and reported insomnia and that functioning was very difficult, but she denied depressed mood or diminished interest or pleasure. Interventions she had tried had not provided any relief. Plaintiff's physical symptoms were causing increased anxiety and depression. (Tr. 658). Plaintiff reported that she had "unrelenting constant nerve pain everywhere" and that she "wipes [her] face every 2-3 minutes"; plaintiff stated she was unable to work because of this, she had a lawyer, and she hoped to get disability; and she had an appointment with a rheumatologist the following week. (*Id*.). On physical examination, the skin on both hands was very dry and her face had erythematous and dry and scaly areas and linear marks that could have been caused by scratching. (Tr. 659). Ms. Johnsen prescribed cetirizine and prednisone. (*Id*.). Ms. Johnsen noted that plaintiff was not on any medications and stated that it would better for plaintiff to see a rheumatologist so that a thorough workup could be done. (Tr. 657).

Plaintiff saw rheumatologist Dr. Yolanda Farhey, M.D., at UC Health on November 11, 2014, on referral from Ms. Johnsen. (Tr. 678-84). Dr. Farhey reported that plaintiff continued to complain of lower back pain of a dull and aching quality with intermittent episodes of sharp and

stabbing pain; some numbness/tingling radiating down both legs to her feet that was constant and most bothersome at night; and dryness in her eyes and lips that was still present. (Tr. 679). Plaintiff also had problems with focus and concentration, muscle pain and tenderness, dry skin and rashes, and hand and knee pain. (*Id.*). The review of systems was positive for dry mouth, dry eyes, arthralgias, back pain, joint swelling, myalgias, neck pain and neck stiffness, and numbness. On physical examination, she exhibited edema and tenderness. (Tr. 680). She had current outpatient prescriptions for amoxicillin-clavulanate (Augmentin), cetirizine (Zyrtex), hydrocodone-acetaminophen (NORCO), 800 mg ibuprofen (Advil, Motrin) three times daily, prednisone (Deltasone), Duloxetine (Cymbalta) and hydroxychloroquine (Plaquenil). (Tr. 680). Plaintiff's encounter diagnoses were Sjogren's disease, autoimmune disease, and fibromyalgia which Dr. Farhey planned to treat with Plaquenil 200 mg bid, a tapered dose of Prednisone, a trial dose of Cymbalta, and exercise. (Tr. 684). She ordered x-rays of the lumbar spine, hands and knees and considered repeating plaintiff's EMG.

Dr. Farhey sent a letter to Ms. Johnsen dated November 13, 2014, summarizing her initial visit with plaintiff. (Tr. 673-74). Dr. Farhey reported that plaintiff had a 20-year history of chronic lower back pain of a dull and aching quality with intermittent episodes of sharp and stabbing pain; some numbness/tingling radiating down both legs to her feet that was constant and most bothersome at night; and dryness in her eyes and lips that was still present. (Tr. 673). She reported that plaintiff has problems with focus and concentration, muscle pain and tenderness, dry skin and rashes, and hand and knee pain. (*Id.*). Imaging studies performed in connection with the consultation showed degenerative disc disease at L5-S1 and mild facet arthropathy with slight retrolisthesis of L4 over L5; no significant osseous abnormality of the knees and small

16

radiopaque densities over the anterolateral aspect of the proximal right leg; and mild first IP arthrosis of the right hand and mild to moderate first CMC arthrosis of the left hand. (Tr. 676).

Plaintiff saw Ms. Johnsen again on December 2, 2014 for (1) follow-up of chronic pain and autoimmune symptoms, and (2) completion of disability paperwork. (Tr. 654-56). Ms. Johnsen reported that plaintiff "was seen by rheumatologist, but did not complete paperwork because has seen patient only once. Completed very subjective paperwork today, all based on what [patient] states she can and cannot do. Will complete and she can take to lawyer." (*Id.*). Plaintiff reported dizziness, gait disturbance, and neuropathy. (Tr. 654). The only active medication listed was cetirizine. (Tr. 655).

The paperwork Ms. Johnsen referenced is an "Auto Immune Disorder Medical Assessment Form" dated December 2, 2014. (Tr. 431-35). Ms. Johnsen indicated on the form that plaintiff began treatment in September 2013 with a physician at The Christ Hospital who ordered physical therapy. (Tr. 431). She stated that plaintiff had Sjogren's disease, fibromyalgia, and another unspecified autoimmune disease. The only positive clinical findings and test results she identified were positive ANA titers from February 18, 2011 and September 11, 2013. She indicated plaintiff had pain/paresthesia in her arms from above the elbows to the hands and from the thighs to the tips of the toes. (Tr. 432). Her assessment indicates that plaintiff experienced symptoms that interfered with the attention and concentration needed to perform even simple work tasks so that she would likely be "off task" at least 15% of the time. She also indicated that in a competitive job, plaintiff would be unable to perform or be exposed to routine, repetitive tasks at a consistent pace, detailed or complicated tasks, and fast paced tasks. She estimated that plaintiff could walk 0 city blocks without rest or severe pain. She indicated that plaintiff can sit for one hour at a time before she must get up and move around; she

can stand for no more than 10 minutes before she must either sit, lie down or move around; she can sit and stand/walk less than two hours total in an 8-hour work day; and she will need to take four unscheduled restroom breaks during an average workday and an additional ten unscheduled breaks during an average workday to lie down, rest, etc. (Tr. 433). Ms. Johnsen indicated that plaintiff cannot lift more than 10 pounds and she can never twist or bend. (Tr. 434). Ms. Johnsen also reported that plaintiff can perform the following activities for only 25% of the workday: use her hand to grasp, turn or twist objects, use her fingers for fine manipulations, and use her arms for overhead reaching. In addition, Ms. Johnsen reported that plaintiff must avoid all exposure to cold, heat, high humidity, sunlight, and ultraviolet light. Ms. Johnsen noted that plaintiff would experience "bad days" and would be absent from work as a result of her impairments and/or treatment more than four days each month. (Tr. 435).

Dr. Douglas Behrman, M.D., signed a statement on December 31, 2014 asserting that he was the supervising physician directly responsible for the care provided to plaintiff by Ms. Johnsen and he had reviewed the assessment completed by Ms. Johnsen. (Tr. 442). Dr. Behrman stated: "Based on my education training and experience together [sic] my review of Ms. Shaw's treatment records and based upon my own clinical examinations, I agree with the opinions stated therein and they are consistent with my own opinions." (*Id*.).

On follow-up with Dr. Farhey in December 2014, plaintiff reported that she had more muscle pain and tenderness, she had back pain and numbness in her legs, and she felt weak. (Tr. 685). The review of systems was positive for fatigue. (Tr. 692). Plaintiff reported she could not tolerate Cymbalta, Plaquenil, and Vitamin D. She had rashes and dry skin. She exhibited tenderness but no edema on exam. (Tr. 686, 692). The plan was to try Savella (a drug used to

treat fibromyalgia) and order an EMG of the lower extremities. Plaintiff was to exercise and take Vitamin D. (Tr. 688).

Progress notes completed by Dr. Farhey's staff on December 18, 2014, reflect that plaintiff reported that she was most bothered by general muscle pain and severe nerve pain. (Tr. 689). She reported that she had developed problems with sedation issues and skin issues from her medications. Plaintiff stated she was not trying medications at that time due to intolerance. Plaintiff reported that she could dress herself, get in and out of bed, and get in and out of a car or other vehicle with difficulty; she could get a good night's sleep with difficulty; she could lift a full cup or glass to her mouth and turn regular faucets on and off easily; she could walk outdoors on flat ground and wash and dry her entire body easily; she could bend down to pick up clothing from the floor and walk two or three kilometers painfully; and she could deal with feelings of anxiety or depression with difficulty. (Tr. 689-90).

Plaintiff underwent an EMG for left lumbosacral radiculopathy on January 23, 2015. (Tr. 674). The EMG was an abnormal study due to the needle exam results, which showed moderate fibrillation in the left lumbosacral paraspinal muscles. According to the report, this was a nonspecific finding that could be observed in many conditions and it required clinical correlation. The nerve conduction studies of the left lower extremity were normal.

Dr. Farhey's March 2015 treatment notes report that little had changed from plaintiff's prior visit. (Tr. 704-11). Plaintiff complained that her fingers/hands and knee had bothered her the most recently; she was unable to take the medication Savella due to skin issues; and she had started Gabapentin but had developed muscle pain at night. (Tr. 704). Dr. Farhey reported that plaintiff was in for follow-up of fibromyalgia, Sjogren's disease, back pain, osteoarthritis of the hand, and degenerative disc disease of the lumbar spine. (Tr. 706). Plaintiff reported back and

19

leg pain, severe fatigue, and brain fog. Dr. Farhey reported that the EMG showed no radiculopathy but little fibrillation on the spinal muscle. The review of systems was positive for arthralgias, back pain, myalgias, neck pain, and neck stiffness. (Tr. 707). Physical examination disclosed "multiple tender points." (Tr. 708). The plan was to start a trial of Topirimate (Topamax) gradually and for plaintiff to exercise and see the dermatology department. (Tr. 711).

On a follow-up visit to Dr. Farhey in July 2015, plaintiff had more rashes but she reported the cream provided by dermatology did not help; she reported she had generalized pain but could not tolerate Topamax which she had been prescribed because it made her sleepy and gave her muscle pain; and she was not taking anything for back pain, muscle pain, or "nerve pain." (Tr. 828). Plaintiff reportedly could not tolerate Lyrica, Neurontin, Topamax, Cymbalta, Savella, Effexor or topicals for dry eyes or dry mouth. (Tr. 832). Dr. Farhey suggested physical therapy and acquatic therapy since plaintiff could not take medication. (*Id.*).

Dr. Farhey completed a "Fibromyalgia Medical Source Statement" on July 15, 2015. (Tr. 847-50). She did not specify in the spaces provided for doing so on the document the location of plaintiff's pain or assess any functional limitations. (Tr. 847-50). Dr. Farhey reported that she saw plaintiff every 3-6 months for 8 months. She checked a box to indicate that plaintiff met the ACR criteria for fibromyalgia and also diagnosed plaintiff with Sjorgen's disease, an unspecified autoimmune disease, degenerative disc disease of the lumbar spine, and osteoarthritis of both hands. Dr. Farhey opined that plaintiff's prognosis was "life-long." The clinical findings she listed were lumbar and hand x-rays which disclosed degenerative disc disease and mild to moderate arthrosis. Dr. Farhey checked boxes on the form indicating plaintiff had the following symptoms: multiple tender points, nonrestorative sleep, chronic fatigue, morning stiffness, muscle weakness, subjective swelling, numbness and tingling, Sicca symptoms, and depression.

20

(Tr. 847). Dr. Farhey also indicated that emotional factors contributed to the severity of plaintiff's symptoms and functional limitations.

Dr. David Chiappone, Ph.D., performed a consultative psychological evaluation of plaintiff at the request of the state agency on October 24, 2013. (Tr. 420-28). Plaintiff reported that she had stopped working as a nurse at a clinic in December 2012 because of pain and an inability to maintain pace. (Tr. 421). She also reported some memory problems toward the end of her work career. Plaintiff was not taking any medications currently and she had never taken psychotropic medications. (Tr. 422). Dr. Chiappone observed that plaintiff was somewhat depressed and "appeared to be quite preoccupied about her health." (Tr. 423). Plaintiff reported that she did not sleep well and that her energy level fluctuated. (Tr. 424). She reported she had lost interest in some activities and had daily crying spells. The only abnormal mental content findings were a preoccupation with her physical condition during the session and below average concentration, attention and memory. (Tr. 424-25).

Dr. Chiappone concluded that plaintiff endorsed symptoms suggestive of depression and somatoform disorder-NOS. (Tr. 426). He opined that she would have "some difficulty remembering information over time"; "some difficulty maintaining attention and concentration over time"; "difficulty dealing with co-workers and supervisors" due to her preoccupation with her health status; and "difficulty dealing with stress on jobs" due to her preoccupation with her health condition, her low-average intellectual functioning, and depression. (Tr. 427-28).

### c. Alleged errors in the ALJ's fibromyalgia analysis

Plaintiff alleges the ALJ improperly dismissed clinical findings of tender points made by her medical providers as too imprecise (Doc. 6 at 5, citing Tr. 17, 567, 635, 708, 830); the ALJ improperly referenced a medical text on fibromyalgia without including it in the record (*Id.*,

citing Tr. 17); the ALJ did not recognize that fatigue, which is documented in the medical records, is a symptom of fibromyalgia which would prevent plaintiff from engaging in light or medium work on a sustained basis (*Id.* at 6, 7, citing Tr. 431, 442, 646, 775, 847); and the ALJ failed to consider plaintiff's fibromyalgia in combination with her other impairments, including lumbar spine and leg impairments shown on the EMG (Tr. 674) and lesions and osteoarthritis of the hands (*Id.* at 7, citing Tr. 819-20, 841).

Plaintiff has not shown that the ALJ erred by failing to consider the combined effects of her severe impairments. "An ALJ's individual discussion of multiple impairments does not imply that he failed to consider the effect of the impairments in combination, where the ALJ specifically refers to a 'combination of impairments' in finding that the plaintiff does not meet" a listed impairment. *Loy v. Sec'y of Health & Human Servs.*, 901 F.2d 1306, 1310 (6th Cir. 1990). *See also Hill v. Commissioner of Social Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014). Here, the ALJ found that plaintiff had the severe impairments of fibromyalgia, Sjogren's Syndrome, mild to moderate osteoarthritis of the bilateral hands and lumbar spine, "auto immune disorder, unspecified," dermatitis, affective disorders, and somatoform disorder. (Tr. 15). The ALJ found these "combined impairments" are severe, but he also found that plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of the Listings for major dysfunction of a joint due to any cause, disorders of the spine, dermatitis, immune deficiency disorders, Sjogren's syndrome, an affective or somatoform disorder, or fibromyalgia. (Tr. 17-18). Thus, plaintiff's argument that the ALJ erred by failing to consider the combined effects of her impairments is not supported by the record.

Plaintiff also argues that the ALJ erred by referencing the ACR criteria for a valid fibromyalgia diagnosis without incorporating the cited text into the record. (Tr. 17). As

22

explained above, the ACR diagnostic criteria for fibromyalgia cited by the ALJ are incorporated into SSR 12-2p. *See Herzog*, 2017 WL 4296310, at *2. The ALJ committed no error by referencing the ACR report that sets forth the criteria adopted by the agency.

Plaintiff argues that the ALJ improperly dismissed clinical findings of tender points made by her medical providers as "too imprecise." (Doc. 6 at 5, citing Tr. 17, 567, 635, 708, 830).[8] Plaintiff argues that because the medical records document tender points on examination as required for a diagnosis of fibromyalgia, the ALJ's RFC for medium work is unsupported. (Doc. 8 at 6). Plaintiff's argument is an apparent reference to the ALJ's finding at step three of the sequential evaluation that the 18 tender points specified in the ACR criteria for a valid fibromyalgia diagnosis (and in SSR 12-2, § II.A) were not identified during plaintiff's examinations. (Tr. 17, citing Tr. 650-76, 678-725). The ALJ's finding is accurate. "Multiple tender points" were noted on physical examination. (See, e.g., Tr. 566, 708, 830). However, the number or location of the tender points is not identified. (*Id*.). The ALJ nonetheless did not reject the diagnosis of fibromyalgia made by plaintiff's treating and examining providers on this or any other ground. Plaintiff therefore has shown no error in this regard.

Insofar as plaintiff argues that the ALJ erred by commenting on and considering "normal physical exams" because fibromyalgia does not produce objective findings on physical examination, the ALJ repeatedly referenced normal test results and negative examination findings when evaluating plaintiff's credibility and weighing the medical opinion evidence. Plaintiff's arguments are therefore addressed in connection with plaintiff's second and third assignments of error, which challenge the ALJ's evaluation of the medical opinion evidence and his assessment of plaintiff's credibility.

---

[8] There is no finding of tender points at Tr. 567.

Plaintiff alleges that the ALJ erred by specifically failing to recognize that fatigue, which is documented in the medical records, is a symptom of fibromyalgia which would prevent her from performing light or medium work on a sustained basis. (*Id*. at 6, 7, citing Tr. 431, 442, 646, 706, 775, 847). Plaintiff testified at the ALJ hearing that she has trouble sleeping at night and usually wakes up every hour to 1 ½ hours because of pain and restlessness, and she rests 1-2 hours during the day. (Tr. 53, 56). Plaintiff also complained of "excessive daytime sleepiness, fatigue, [and] low energy" to Dr. Zadikoff in June 2014 (Tr. 646) and fatigue or "severe fatigue and brain fog" to Dr. Farhey in December 2014 and March 2015 (Tr. 706, 775), and Dr. Farhey documented symptoms of nonrestorative sleep and chronic fatigue in her July 2015 assessment (Tr. 847). The ALJ was not bound to accept plaintiff's complaints of excessive fatigue and to find that her fatigue was debilitating based solely on her subjective complaints and the diagnosis of fibromyalgia. *Dragan*, 2011 WL 7430207, at *6. The ALJ was, however, obligated to consider the credibility of plaintiff's complaints of fatigue and other alleged symptoms under the standards of review that apply in a case of fibromyalgia. Whether the ALJ did so will be addressed in connection with plaintiff's third assignment of error challenging the ALJ's credibility assessment.

Except as to those allegations of error to be addressed in connection with the ALJ's weighing of the medical opinion evidence and his credibility finding, plaintiff's first assignment of error should be overruled.

## 2. The ALJ's weighing of the medical opinion evidence

Plaintiff alleges as her second assignment of error that the ALJ failed to properly weigh the medical opinion evidence. (Doc. 6). Plaintiff argues that the ALJ erroneously gave the greatest weight to the November 2013 assessment of non-examining physician Dr. Teresita

Cruz, M.D., who assessed plaintiff as capable of performing medium work (Tr. 117-118). (Doc. 6 at 6-9).[9] Plaintiff contends the ALJ was not entitled to rely on Dr. Cruz's assessment because she had only a portion of the medical records before her and the ALJ failed to consider the medical records that Dr. Cruz did not review, which included Dr. Farhey's treatment records from November 2014 and later dates; the January 2015 EMG results and the November 2014 hand x-rays (Tr. 674-76); and symptoms of fatigue, tender points, skin rashes and inefficacy of medications reported in the medical records. (*Id*. at 8). Plaintiff contends the ALJ was bound to give the most weight to the assessment of her treating rheumatologist, Dr. Farhey. (*Id*. at 9). Plaintiff acknowledges that Dr. Farhey did not assess her functional capacity; however, plaintiff alleges that her symptoms of "fatigue, morning stiffness, [and] non-restorative sleep" that Dr. Farhey documented would preclude medium work. (*Id*.). Plaintiff argues that rather than considering the impact of these symptoms when weighing the medical opinion evidence, the ALJ erroneously took into account normal examination findings and the absence of objective findings. (*Id*. at 5-6). Plaintiff also contends that the ALJ erroneously failed to apply a "more rigorous standard" of review to the state agency reviewer's assessment than to the treating or examining sources' opinions. (*Id*. at 8, citing *Gayheart*, 710 F.3d at 379-80). Finally, plaintiff argues that the ALJ erred by failing to give "significant weight" to examining psychologist Dr. Chiappone's finding that she would have difficulty with attention and concentration, dealing with coworkers, and handling stress. (*Id*. at 9).

In response, the Commissioner alleges that the ALJ did not err by improperly weighing the medical opinion evidence. (Doc. 7). The Commissioner argues that plaintiff did not provide a medical opinion from Dr. Farhey or any other treating provider who assessed the

---

[9] Plaintiff also challenges the weight the ALJ gave the medical source opinions as part of the first assignment of error, and those arguments will be considered here.

severity of her symptoms or the manner and degree to which her symptoms limited her so as to support her claim that her fibromyalgia imposed debilitating work-related limitations. (*Id.* at 10). The Commissioner acknowledges that the ALJ did not give reasons for affording only "limited weight" to Dr. Farhey's opinion; however, the Commissioner alleges the ALJ's omission is harmless error because Dr. Farhey's "opinion is not inconsistent with the ALJ's decision." (*Id.* at 11-12, citing *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010); *Watters v. Comm'r of Soc. Sec.*, 530 F. App'x 419, 423 (6th Cir. 2013)). The Commissioner argues that neither Dr. Farhey's assessment nor her treatment records, which document largely unremarkable clinical findings and diagnostic test results, are inconsistent with the ALJ's RFC finding. (*Id.* at 13). The Commissioner asserts that on the other hand, the ALJ gave "legally proper reasons" for giving greater weight to Dr. Cruz's opinion, which the Commissioner contends is supported by the record as a whole. (*Id.* at 14, citing Tr. 23, 117-18). Finally, the Commissioner alleges that although the ALJ gave Dr. Chiappone's opinion only "some weight," the ALJ credited his assessment of plaintiff's mental limitations and incorporated them into the mental RFC finding. (*Id.* at 14-15).

If the ALJ does not afford a treating source's opinion controlling weight, the ALJ must "must apply certain factors - namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source - in determining what weight to give the opinion." *Wilson*, 378 F.3d at 544; *see also* 20 C.F.R. §§ 404.1527(c), 416.927(c). Further, when the ALJ does not give a treating source opinion controlling weight, the ALJ will generally give more weight to the opinion of a source who has examined the claimant than to the opinion of a source who has not examined the claimant. 20 C.F.R. §§ 404.1527(c)(1)(2), 416.927(c)(2); *Ealy v. Commissioner of Social Sec.*,

594 F.3d 504, 513 (6th Cir. 2010). The ALJ weighs any medical opinions by examining and

non-examining sources based on the physician's examining relationship (or lack thereof),

specialization, consistency, supportability of the opinion, and other factors "which tend to

support or contradict the opinion." 20 C.F.R. §§ 404.1527(c), 416.927(c). *See also* SSR 96-6p.

"Importantly, the Commissioner imposes on its decision makers a clear duty to 'always

give good reasons in [the] notice of determination or decision for the weight [given a] treating

source's opinion.'" *Cole*, 661 F.3d at 937 (citation omitted). *See also Wilson*, 378 F.3d at 544

(ALJ must give "good reasons" for the ultimate weight afforded the treating physician opinion).

Those reasons must be "supported by the evidence in the case record, and must be sufficiently

specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating

source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937. This

procedural requirement "ensures that the ALJ applies the treating physician rule and permits

meaningful review of the ALJ's application of the rule." *Gayheart v. Comm'r of Soc. Sec.*, 710

F.3d 365, 376 (6th Cir. 2013) (quoting *Wilson*, 378 F.3d at 544).

Under the Social Security regulations, the opinions of state agency medical and

psychological consultants may be entitled to significant weight where they are supported by

record evidence. *Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 713 (6th Cir. 2013); 20 C.F.R.

§§ 404.1527(e)(2)(i), 416.927(e)(2)(i)). The ALJ can reasonably credit the opinion of a

reviewing medical source, despite the fact that the source did not have access to the entire

record, where the conclusion that the claimant retained the capacity to work was supported by

the totality of the medical and vocational evidence in the record. *Glasgow v. Comm'r of Soc.

Sec.*, 690 F. App'x 385, 387 (6th Cir. 2017) (citing *McGrew v. Comm'r of Soc. Sec.*, 343 F.

App'x 26, 32 (6th Cir. 2009) (concluding that an ALJ may rely on a state agency physician's

opinion that is not based on all of the medical evidence in the record if the ALJ takes into account any evidence that the physician did not consider)). The ALJ fails to comply with the governing regulations when he subjects the opinions of the treating providers to greater scrutiny than the opinion of the one-time examiner. *Gayheart*, 710 F.3d at 379 ("A more rigorous scrutiny of the treating-source opinion than the nontreating . . . opinions is precisely the inverse of the analysis that the regulation[s] require.") (citing 20 C.F.R. § 404.1527(c), SSR 96-6p, 1996 WL 374180, at *2 (July 2, 1996)).

Plaintiff has not shown that the ALJ improperly weighed the psychological opinion evidence of record. The ALJ gave "some weight" to Dr. Chiappone's assessment that plaintiff would have "some difficulty remembering information over time and some difficulty maintaining attention and concentration over time, difficulty dealing with coworkers and supervisors, and dealing with give and take on the jobsites due to physical pain . . . and difficulty dealing with stress on the job." (Tr. 23-24). Although the ALJ gave Dr. Chiappone's assessment only "some weight," he credited the assessment to the extent plaintiff would have issues with attention and concentration, difficulties dealing with coworkers and supervisors, and issues dealing with stress by limiting plaintiff to simple tasks not involving production rate pace; only superficial interaction with coworkers and supervisors and only occasional interaction with the public; and no more than ordinary and routine changes in the workplace. (Tr. 23-24). Plaintiff has not shown that the ALJ was required to give Dr. Chiappone's assessment greater weight and has not identified any additional mental functional restrictions that are supported by Dr. Chiappone's assessment. Plaintiff has shown no error in this regard.

The ALJ erred by failing to comply with the governing law and applicable regulations when weighing the medical source opinions related to plaintiff's physical impairments and limitations. The ALJ gave "great weight" to the assessment of state agency reviewing physician Dr. Teresita Cruz, M.D., who assessed plaintiff in November 2013 as capable of performing medium level work. (Tr. 23). Dr. Cruz found opined that plaintiff could lift 50 pounds occasionally and 25 pounds frequently, stand and sit about 6 hours each in an 8-hour workday, climb ramps/stairs, kneel, crawl, balance and stoop frequently, and climb ladder/ropes/scaffolds occasionally. (Tr. 117-18). Dr. Cruz reported that she based her assessment on plaintiff's September 2013 diagnoses of chronic back pain, compressive neuropathy, Sjogren's syndrome, and GERD and on plaintiff's "normal" physical exam. (Tr. 118). The sole reason the ALJ gave for crediting Dr. Cruz's assessment for medium exertional work was the opinion was "not inconsistent with the normal physical examinations as reported in the medical evidence." (Tr. 23). The ALJ did not conduct any analysis of the non-examining physician's findings as compared to the medical evidence of record and did not mention any of the regulatory factors to be considered in weighing her opinion. The ALJ's decision to give Dr. Cruz's opinion "great weight" is not supported by substantial evidence for this reason.

The ALJ also erred by failing to take into account the totality of the medical evidence that was generated after Dr. Cruz's November 2013 opinion when evaluating Dr. Cruz's opinion. This evidence includes substantial medical records that document plaintiff's fibromyalgia, which Dr. Cruz gave no indication that she considered, and associated multiple subjective complaints. (Tr. 117-18). The ALJ reviewed this medical evidence in his written decision and he found fibromyalgia was a severe impairment (Tr. 15-16, 20-22), but there is no

indication in the ALJ's written decision that he properly accounted for plaintiff's fibromyalgia and accompanying symptoms when determining the weight to give Dr. Cruz's assessment. To the contrary, the ALJ repeatedly referenced normal examination findings in the treating and examining providers' records and expressly relied on the "normal physical examinations" to credit Dr. Cruz's opinion. (Tr. 23). The ALJ noted that medical evidence included normal physical exam findings by Dr. Koduri in September 2013 (Tr. 402, 404) and December 2013 (Tr. 584); a normal neurological examination by Dr. Zadikoff in June 2014 with findings of normal motor strength bilaterally, no pronator drift, normal bulk, normal posture, gait and coordination, no involuntary movements, no limb ataxia, normal muscle stretch reflexes (Tr. 647); essentially normal examination findings by plaintiff's primary care provider from May 2014 to March 2015 (Tr. 652, 655, 658, 665, 668, 671); and findings by Dr. Farhey of normal range of motion in March and July in 2015 (Tr. 708, 836) and no edema, no cervical adenopathy, a normal neurological exam with no cranial nerve deficit, normal muscle tone and coordination, and normal lab values (Tr. 708, 709). (Tr. 20-22). Because the medical evidence that post-dates Dr. Cruz's assessment substantiates plaintiff's fibromyalgia diagnosis, which Dr. Cruz did not acknowledge in her assessment, the ALJ erred by crediting Dr. Cruz's opinion based on the absence of objective findings in the record. *See Rogers*, 486 F.3d at 244; *Preston*, 854 F.2d at 820; *Swain*, 297 F. Supp.2d at 990. The medical evidence generated subsequent to Dr. Cruz's report is not consistent with her assessment for medium level work which she based on a "normal" physical exam. *See Glasgow*, 690 F. App'x at 387; *McGrew*, 343 F. App'x at 32.

Further, the ALJ erred by failing "to apply the same level of scrutiny" to the assessment of the state agency physician that he applied to the opinions of plaintiff's primary care providers,

Ms. Johnsen and Dr. Behrman. In contrast to the one-sentence reason the ALJ gave for crediting Ms. Cruz's assessment, the ALJ explained in detail his reasons for giving "[v]ery limited weight" to Ms. Johnsen's December 2014 "Auto Immune Disorder Medical Source Statement" and to Dr. Behrman's statement co-signing the assessment as the supervising physician. (Tr. 23). The ALJ discounted their opinions because: (1) the assessment was based on plaintiff's subjective statements; (2) Ms. Johnsen reported that plaintiff had been seen by a rheumatologist who had not completed disability paperwork; (3) the office notes show that plaintiff's physical exam was normal; (4) the office notes show that plaintiff's mental status examination findings were normal; and (5) Dr. Behrman had examined plaintiff only once, which was on March 15, 2015. (Tr. 23, citing Tr. 430-35, 437-41, 852). The ALJ's more rigorous scrutiny of the treating source opinions as compared to the non-examining physician's opinion "is precisely the inverse of the analysis that the regulation[s] require." *Gayheart*, 710 F.3d at 379 (citing 20 C.F.R. § 404.1527(c), SSR 96-6p, 1996 WL 374180, at *2).[10]

Further, the ALJ's decision to discount the opinion of treating specialist, Dr. Farhey, regarding plaintiff's diagnoses and symptoms is not substantially supported by the record. The ALJ gave "little weight" to Dr. Farhey's partially completed "Fibromyalgia Medical Source Statement" dated July 2015. (*Id.*, citing Tr. 846-50). The ALJ noted that Dr. Farley listed plaintiff's diagnosed impairments as Sjorgen's disease, autoimmune disease, degenerative disc disease of the lumbar spine, and osteoarthritis of both hands; she reported imaging findings showing lumbar degenerative disc disease and mild to moderate hand arthrosis; she listed symptoms of "multiple tender points, nonrestorative sleep, chronic fatigue, morning stiffness,

---

[10] The ALJ properly discounted Dr. Behrman's July 8, 2015 assessment that plaintiff was unable to work for the foreseeable future due to back pain (Tr. 23, citing Tr. 852) on the ground it was a determination reserved for the Commissioner. *See* 20 C.F.R. §§ 404.1527(d)(1)(3), 416.927(d)(1)(3) ("Whether a person is disabled within the meaning of the Social Security Act is an issue reserved to the Commissioner, and a physician's opinion that his patient is disabled will not be given "any special significance.").

muscle weakness, subjective swelling, numbness and tingling, Sicca symptoms, and depression"; and she opined that emotional factors contributed to the severity of plaintiff's symptoms and functional limitations. (*Id.*). The ALJ also noted that Dr. Farhey did not complete the workplace limitations section of the assessment. (*Id.*). The ALJ did not go beyond summarizing the contents of Dr. Farhey's partial assessment and evaluate it in accordance with the regulatory factors, as the Commissioner concedes. (Doc. 7 at 11-12). The ALJ simply stated that he was giving "limited weight" to Dr. Farhey's partial assessment. Although the ALJ was not bound to credit Dr. Farhey's opinion, the ALJ was required to evaluate her opinion as to plaintiff's diagnoses and symptoms in accordance with the relevant regulatory factors. The ALJ erred by failing to conduct any analysis of Dr. Farhey's assessment.

The Commissioner argues that the ALJ's failure to give "good reasons" for rejecting Dr. Farhey's opinion was harmless. A violation of the "good reasons rule" can be deemed to be harmless error if "(1) a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it; (2) if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion; or (3) where the Commissioner has met the goal of § [1527(c)(2)] . . . even though he has not complied with the terms of the regulation." *See Cole*, 661 F.3d at 940 (citing *Friend*, 375 F. App'x at 551 (quoting *Wilson*, 378 F.3d at 547)). None of these circumstances apply here. The ALJ erroneously evaluated the medical opinion evidence based on the absence of objective findings and abnormal physical examinations, which are of little relevance to plaintiff's claim of disability in light of her fibromyalgia diagnosis. The absence of objective findings was not a valid basis, standing alone, for the ALJ to credit the opinion of the state agency reviewing physician and to fail to properly consider the

substantial medical treatment notes and opinion evidence of fibromyalgia generated subsequent to the non-examining physician's assessment. The ALJ's error cannot be disregarded as harmless.

Plaintiff's second assignment of error should be sustained.

### 3. The ALJ's credibility finding

Plaintiff alleges the ALJ did not consider all of the regulatory factors in assessing her credibility. (Doc. 6). Plaintiff alleges that the ALJ failed to consider objective medical evidence; plaintiff's self-reports of symptoms, limitations and medication side-effects; and plaintiff's work history. The Commissioner alleges that in assessing plaintiff's credibility, the ALJ reasonably took into account the diagnostic tests, the clinical findings, and evidence that plaintiff sought treatment in part to obtain documentation of her disability claim. (Doc. 7).

Title 20 C.F.R. §§ 404.1529 and 416.929 and Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996)[11] describe a two-part process for assessing the credibility of an individual's statements about symptoms, including pain. First, the ALJ must determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged; second, the ALJ must evaluate the intensity, persistence, and functional limitations of those symptoms by considering objective medical evidence and other evidence, including: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms;

---

[11] Effective March 2016, SSR 96-7p has been superseded by SSR 16-3p, 2016 WL 1119029, which "provides guidance about how [the SSA] evaluate[s] statements regarding the intensity, persistence, and limiting effects of symptoms." There is no indication in the text of SSR 16-3p that the SSA intended to apply SSR 16-3p retroactively, and the Ruling therefore does not apply here. *Accord Cameron v. Colvin*, No. 1:15-cv-169, 2016 WL 4094884, at *2 (E.D. Tenn. Aug. 2, 2016).

(6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms. *Id.* "[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). "Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Id*. Further, the ALJ must clearly state his reasons if he rejects a claimant's testimony as incredible. *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). The ALJ's articulation of reasons for crediting or rejecting a claimant's testimony must be explicit and "is absolutely essential for meaningful appellate review." *Hurst v. Sec. of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985) (citing *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984)).

Here, the ALJ erred by relying on a lack of objective test results and clinical findings to discount plaintiff's credibility. (Tr. 24). As discussed in connection with plaintiff's second assignment of error, the ALJ repeatedly referenced plaintiff' normal examination findings when summarizing the medical evidence that he relied on in discounting plaintiff's credibility. (*See supra*, pp. 29-30). The ALJ relied primarily on the normal physical examination findings in assigning weight to the medical providers' opinions. (Tr. 23). The ALJ then concluded that plaintiff's claims of debilitating pain and other symptoms were not credible due primarily to these normal findings, stating:

> In sum, the [ALJ] does not imply that the claimant is symptom-free, but a review of the medical evidence of record persuades the undersigned that the claimant's complaints of pain and incapacitation are not credible when viewed in the light of the normal physical examinations, which do not support her subjective complaints. Diagnostic testing shows mild to moderate impairments. The claimant consulted with many specialists and underwent testing in an effort to have disability paperwork completed and establish disability, but the medical

34

findings upon examination do not support the claimant's assertions to the extent of her subjective limitations. . . .

(Tr. 24).

Insofar as the ALJ relied on normal physical examination findings to discount plaintiff's subjective complaints related to her fibromyalgia, the ALJ demonstrated a fundamental misunderstanding of the disease. The ALJ failed to recognize that objective tests and clinical findings are of little relevance in determining the existence or severity of fibromyalgia, which cannot be confirmed by objective findings. *See Rogers*, 486 F.3d at 245; *Preston*, 854 F.2d at 820; *Kalmbach*, 409 F. App'x at 864 (the absence of objective medical evidence to substantiate the diagnosis of fibromyalgia or its severity is basically irrelevant); *Germany-Johnson,* 313 F. App'x 771. As in *Rogers*, the ALJ here "did not discuss, let alone apply, the correct standard for assessing a diagnosis of fibromyalgia in his decision" and instead relied on normal test results and normal physical findings, *i.e.*, normal "strength, reflexes, gait, and range of motion," none of which are relevant to the severity of plaintiff's fibromyalgia symptoms. *See Germany-Johnson*, 313 F. App'x at 778 (citing *Rogers*, 486 F.3d at 245); *see also Preston*, 854 F.2d at 820. Accordingly, the ALJ's reliance on objective findings which purportedly failed to corroborate plaintiff's subjective complaints of pain and other symptoms was in error under the governing case law.

In addition, the ALJ's credibility assessment is not supported by substantial evidence because the ALJ gave no indication that he factored into the credibility analysis relevant considerations including plaintiff's daily activities and factors that precipitate and aggravate her pain and symptoms. (Tr. 20-24). The ALJ summarized plaintiff's testimony regarding her subjective complaints and her daily activities in his written decision. (Tr. 20). The ALJ noted that plaintiff allegedly stopped working due to symptoms of neuropathic pain, Sjogren's

disorder, fibromyalgia and autoimmune disorders which caused severe nerve pain, fatigue, and problems focusing and concentrating necessary for multitasking. She described "textbook symptoms" of Sjogren's disease. She has neuropathic pain in the lower extremities. Her fibromyalgia affects her legs, back and upper arms. Prolonged sitting, standing and walking aggravate her back. She has problems with her hands, thumbs and fingers and trouble holding onto things several times a week. She has "severe brain fog and fatigue" and usually lies down for one to two hours each day. She could not tolerate medication prescribed by Dr. Farhey due to side effects that include skin irritation, muscle pain, and brain sedation; Benadryl makes her sleepy; and she cannot use soap due to skin irritations and experiences flare-ups of skin irritation. Her daily activities reportedly consist of light housekeeping, dishes and light mopping with 10-minute breaks after 30 minutes. She had been missing church more lately due to her medical problems and she has no social life. Plaintiff reportedly can stand about 10 minutes due to nerve pain and intermittent burning in the lower legs and feet; sit no more than an hour before needing to get up and move around for 10-15 minutes; usually walk no more than one block; and lift under 10 pounds because lifting aggravates her low back and she has problems gripping things at times. She allegedly also has problems due to "brain fog." (Tr. 20).

Although the ALJ set forth in some detail plaintiff's subjective complaints of pain and other symptoms and how her pain and symptoms impact her daily activities, the ALJ did not explain how plaintiff's restricted daily activities are inconsistent with her allegations of disabling symptoms. Neither does there appear to be any inconsistency between the daily activities plaintiff described and her allegations of disabling pain and other symptoms. *Cf. Rogers*, 486 F.3d at 248-49 (finding that the plaintiff's "somewhat minimal daily functions" of driving, cleaning her apartment, caring for two dogs, doing laundry, read, performing stretching

exercises, and watching the news, were not "comparable to typical work activities" and did not justify the ALJ's decision to discredit her testimony); *Kalmbach*, 409 F. App'x at 864 (the plaintiff's minimal activities of going to the grocery store, the pharmacy, and church, usually preparing her own meals and dressing herself without assistance, and driving for less than thirty minutes per day were "hardly consistent with eight hours' worth of typical work activities."). In implicitly rejecting plaintiff's testimony as to her pain and subjective complaints, the ALJ relied on normal test results and normal physical findings, none of which are relevant to the severity of plaintiff's fibromyalgia symptoms. *See Germany-Johnson*, 313 F. App'x at 778 (citing *Rogers*, 486 F.3d at 245); *Preston*, 854 F.2d at 820. The ALJ's credibility finding is not supported by substantial evidence and is not entitled to deference for this reason.

Plaintiff's third assignment of error should be upheld.

### 4. The ALJ's step five finding

Plaintiff alleges the ALJ erred at step five of the sequential evaluation process by relying on vocational expert testimony that did not take into account functional hand limitations imposed by her osteoarthritis and mental limitations assessed by the consultative examining psychologist, Dr. Chiappone. (Doc. 6). Resolution of specific questions regarding the sufficiency of the VE's testimony may be impacted by the ALJ's reevaluation of the medical opinion evidence and plaintiff's credibility on remand. Accordingly, the Court need not resolve plaintiff's fourth assignment of error at this time.

## III. Conclusion

In determining whether this matter should be reversed outright for an award of benefits or remanded for further proceedings, the Court notes that all essential factual issues have not been resolved in this matter, nor does the current record adequately establish plaintiff's entitlement to

benefits as of her alleged onset date. *Faucher v. Sec'y of H.H.S.,* 17 F.3d 171, 176 (6th Cir. 1994). This matter should be reversed and remanded for further proceedings with instructions to the ALJ to re-weigh the medical opinion evidence in accordance with this decision, reassess plaintiff's credibility, and further develop the medical and vocational evidence as warranted.

## IT IS THEREFORE RECOMMENDED THAT:

The ALJ's decision be **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.

Date: _1/11/2018_

Karen L. Litkovitz
United States Magistrate Judge

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

MELISSA K. SHAW,
      Plaintiff,

vs.

COMMISSIONER OF
SOCIAL SECURITY,
      Defendant.

Case No. 1:16-cv-1133
Barrett, J.
Litkovitz, M.J.

**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).